E-FILED
Thursday, 27 September, 2012  03:37:13 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Peterjohn Hoffman,                 )
                  Plaintiff         )
                                    )
        v.                       )             Case No. 11-1086
                                    )
Bradley University,               )
                  Defendant      )

ORDER and OPINION

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 USC. § 636(c), and the District Judge has referred the case to me. Now before the Court is the Defendant's motion for summary judgment (#31). The motion is fully briefed, and I have carefully considered the arguments and evidences submitted. As stated herein, the motion is GRANTED.

I.  JURISDICTION AND VENUE

In his complaint, Plaintiff asserted claims under the Civil Rights Act, 42 USC § 1981 as amended by the Civil Rights Act of 1991; the Civil Rights Act of 1964, 42 USC § 2000e-1 et seq,; and the Americans with Disabilities Act, 42 USC. §12101 et seq. Jurisdiction over those claims is found under 42 USC §1331 and 1343. The complaint also included claims arising under Illinois Human Rights Act. Supplemental jurisdiction over those claims is found under 42 USC § 1367.

The events underlying this case occurred in Peoria County, Illinois, which is within the Central District of Illinois. Venue is therefore proper in this Court pursuant to 28 USC §1391. Cases arising in Peoria County are assigned to the Peoria Division. CDIL-LR 40.1.

1

## II.  SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 US 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See *Jay v. Intermet Wagner Inc*., 233 F3d 1014, 1016 (7th Cir 2000); *Cox v. Acme Health Serv.*, 55 F3d 1304, 1308 (7th Cir 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 US 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. *Waldridge v. American Hoechst Corp.*, 24 F3d 918, 922 (7th Cir 1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, *Erdman v. City of Ft. Atkinson,* 84 F3d 960, 961 (7th Cir 1996); *Vukadinovich v. Bd. of Sch. Trustees*, 978 F2d 403, 408 (7th Cir 1992), cert. denied, 510 US 844 (1993); *Lohorn v. Michal*, 913 F2d 327, 331 (7th Cir 1990); *DeValk Lincoln-Mercury, Inc. V. Ford Motor Co.*, 811 F2d 326, 329 (7th Cir 1987); *Bartman v. Allis Chalmers Corp.*, 799 F2d 311, 312 (7th Cir 1986), cert. denied, 479 US 1092 (1987), and construing any doubts against the moving party. *Adickes v. S.H. Kress & Co.*, 398 US 144 (1970); *Trotter v. Anderson*, 417 F2d 1191 (7th Cir 1969); *Haefling v. United Parcel Serv.*, Inc., 169 F3d 494, 497 (7th Cir 1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. *Piscione v. Ernst & Young, L.L.P.*, 171 F3d 527, 532 (7th Cir 1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Village of Winnetka*, 371 F3d 992, 1001 (7th Cir 2004). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, for example, *Jordan v. Summers*, 205 F3d 337, 342 (7th Cir 2000). A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 US at 250.

Admissibility is the threshold question, because a court may consider only admissible evidence in assessing a motion for summary judgment. *Gunville v. Walker*, 583 F3d 979, 985 (7th Cir2009); *Haywood v. Lucent Technologies, Inc.*, 323 F3d 524, 533 (7th Cir2003) (inadmissible evidence will not overcome a motion for summary judgment). See also *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F3d 560, 562 (7th Cir1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial). A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *MMG Fin. Corp. v. Midwest Amusements Park, LLC,* 630 F3d 651, 656 (7th Cir 2011); *Logan v. Caterpillar, Inc.*, 246 F3d 912, 925 (7th Cir2001) (inadmissible hearsay is not enough to preclude summary judgment); *Eisenstadt v. Centel Corp.,* 113 F3d 738, 742 (7th Cir1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial); *Bombard*, 92 F3d at 562 (inadmissible hearsay from an affidavit or deposition will not suffice to overcome a motion for summary judgment).

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. *Hedberg v. Indiana Bell Tel. Co.*, 47 F3d 928, 931 (7th Cir 1995), citing *Anderson*, 477 US at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. *Celotex*, 477 US at 322; *Waldridge*, 24 F3d at 920.

### III.  STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Peterjohn Hoffman was employed by Defendant Bradley University as a police officer from May 10, 2007 until his employment was terminated on November 17, 2009. He is Korean-born, adopted by American parents at the age of 3 months, and he has resided in the United States since his adoption. He became a naturalized citizen at the age of 7.

After he was hired by Bradley, he completed training at the Police Training Academy in Champaign, Illinois, and then, on August 2, 2007, he began participation in the Field Training Officer Program ("FTO") of the Bradley University Police Department. On December 9, 2007, while still in the FTO, Hoffman sustained a work-related injury when he slipped on ice while on duty, tearing his rotator cuff. He had surgery on his shoulder in March of 2008. He continued to have complaints of pain after surgery, and was treated for that pain until June of 2009. He was off work completely until April 28, 2008, when he returned to work with a light-duty restriction. He remained on light duty until he was cleared on June 8, 2009 to resume unrestricted duties as a police officer. He then resumed the FTO program which he completed on November 8, 2009.

While Hoffman was on light duty, he was assigned office work, which included filing papers, filling out arrest cards, cleaning, and other clerical tasks. They were tasks that ordinarily the office

manager, Jocelyn Watkins, would have done. For one month, he also worked some of his hours in the University's Human Resources Department, filing and preparing paperwork for new hires. During that one month period, there was occasional confusion about where Hoffman was.

During this time, Dave Baer, the Chief of Police, asked Hoffman to organize several bookcases of trade magazines. The magazines were related to police work, and according to Watkins, the Chief used them in his role as Chief. There were hundreds of magazines, and the Chief asked Hoffman to stack them into categories and then box them for storage.

Hoffman viewed this task as demeaning and believed that the Chief had assigned it to him in order to humiliate him. He testified that the project took several weeks, during which time Chief Baer frequently checked his work and would get upset if Hoffman was not doing it correctly. He said that "everybody" laughed about the assignment. He believed that no one had ever been asked to do this before, although Watkins testified that she had previously been assigned this task.

Also during his light duty assignment, Hoffman was attending physical therapy during work hours, two times a week for one hour each time. Hoffman testified that Baer asked him on a daily basis about his injury, about what the doctors were saying about it, about when his therapy appointments were, and when he was going to be released from light duty restrictions. At some point, Hoffman provided the Chief with a schedule of his therapy appointments. According to Hoffman, the questions continued even after Chief Baer had his therapy schedule.

In December 2008 or January 2009, while Hoffman was working in the Human Resources Department, he told employee Karen Sorrel that he believed Baer had been harassing him ever since he returned to work on light duty the preceding April. Sorrell went to the Department head Nena Peplow, and Peplow asked Sorrel to encourage Hoffman to meet with her (Peplow). Sorrel had that

5

conversation with Hoffman; he indicated he was uncomfortable going forward with his complaint because he was afraid of retaliation[1].

Eventually, however, Hoffman did request to meet with Peplow via an email dated February 5, 2009. She met with him soon thereafter. He repeated the verbal complaint he made to Sorrel and told Peplow he was afraid of retaliation. Peplow told Hoffman he did not need to worry about retaliation. She asked him to come to her to report any continuing behavior and that she would discuss his concerns with Gary Anna, Bradley's Vice President of Business Affairs.

Peplow did confer with Anna, telling him that Hoffman "felt that he was being checked on, that the chief wanted to know where he was if he wasn't in the office, that he felt that he was being treated in a different manner because of the work comp injury." Hoffman then met with Anna in February 2009, raising orally the same concerns he had raised with Sorrel and Peplow. Anna reminded Hoffman about Bradley's policies and expectations regarding treatment of employees and against retaliation, and he assured Hoffman that he would remind Baer of those policies and "take action if necessary or as appropriate if that kind of behavior exhibited itself." Anna also asked Hoffman to return to him if the behavior continued. Anna followed up by talking to Chief Baer.

About a month later, Baer and another police officer, Sergeant Hutchinson, began making jokes about Hoffman's race[2] after he returned to work on light duty. Hoffman recalled about 4 or 5 times when this occurred before his employment was terminated. The examples Hoffman provides

---

[1] Whether Hoffman communicated his fears of retaliation to either Sorrel or Peplow is disputed. For purposes of this motion, Hoffman's testimony that he did so is accepted as true.

[2] The complaint and the summary judgment documents refer to this as his "race." The more appropriate designation would be national origin. The distinction makes no difference in the analysis of this motion because Plaintiff has abandoned his claims based on national origin. In the interests of accuracy, the Court refers to it as national origin throughout this Order.

include bringing in rice-based food on several occasions and suggesting Hoffman would like it, along with comments that included derogatory names like "slant eyed" and "rice burner." When this happened, Hoffman just laughed and played along; he did not indicate that he was offended, and he never addressed these racial comments in his conversations with Sorrel, Peplow or Anna. He conceded that this conduct did not affect his work or his ability to perform his job, and he generally got along with Hutchinson despite the comments.

Although this behavior again began to concern Hoffman, he did not formally report it to Sorrel, Peplow or Anna. Instead, he mentioned it to Sorrel when he saw her at a Bradley soccer game at some point during 2009[3]. Sorrel suggested that Hoffman share his concerns about the Chief with Lt. Troy Eeten, one of Hoffman's supervisors in the Police Department, before he returned to the Human Relations Department, in accordance with the Employee Handbook's policy for pursuing a grievance. While Hoffman does not dispute that she told him that, he does dispute whether that is the proper procedure when a department head is the harasser. At any rate, Hoffman believed that Sorrel meant that he could not pursue his concerns further with her or with Peplow unless he first talked to Eeten, and, fearing retaliation[4], he declined to talk to Eeten.

Around this same time, he also saw Peplow in her office when he delivered some papers. She asked how things were going, and Hoffman stated that "he's kind of started up again." Peplow told

---

[3]Hoffman was vague about when this soccer game was, describing it as having occurred during March 2009 or as late as the early fall of 2009. Soccer season begins in August and ends in November of the school year, according to Bradleybraves.com.

[4]Hoffman supports his claim that he feared retaliation by citing hearsay statements of other officers. These statements are clearly inadmissible and are not considered by the Court. For purposes of this motion, Hoffman's statement that he feared retaliation will be taken as true.

him to "feel free" to come talk to her if he needed to. Hoffman did not return to talk to Peplow, again fearing retaliation.

At some point around July or August of 2009, there was talk of the possibility of moving Hoffman to second shift to reduce his interaction with Chief Baer. Hoffman, who was divorced with two children, opposed such a transfer because of the impact it would have on his familial responsibilities. He also told Sorrel that he believed the transfer was actually in retaliation for his complaints about Baer's conduct. That transfer apparently never occurred.

During his deposition, Hoffman detailed the Chief's conduct that concerned him. In addition to the "degrading" task of sorting magazines described above, the Chief would ask Hoffman about 5 times a day about his therapy appointments and when they were, or about what his doctor's were telling him and when they might release him, or other questions about or related to his injury. Hoffman also believed that he was "mistreated" once he began raising concerns about the Chief's conduct. In particular, he believed that Sorrel and Peplow had refused to allow him to talk to them, despite Peplow's earlier assurance that he could always come to her. He saw the talk about moving him to second shift as retaliatory. He believed that Sergeant Hutchinson and Chief Baer retaliated against him by joking about his national origin after he returned to work on light duty. He believes that Gary Anna retaliated against him by considering moving him to second shift and by terminating his employment.

On November 8, 2009, Shane Young, another employee of the University's police department, authored an unsolicited document addressed "To whom it may concern." In this five-page, double-spaced typed document (Exh.37 to summary judgment motion), Young sought to "inform all concerned persons" about an incident that had occurred on October 21, 2009. At the

8

time, Young was working 2nd shift at a Bradley men's soccer game. At the front gates to the stadium, 2 students were selling wrist bracelets in memory of another student who had suffered a tragic death the preceding year. Young and Hoffman were working together. Hoffman took 2 of the wristbands without paying for them. It appeared to Young that the bracelets were free to Bradley students but cost $1 for everyone else.

After the game was over, Young stated that he returned to the patrol car where Hoffman asked him what size shirt he wore. Young recounted that Hoffman then disappeared into the stadium ticket office for a brief time. He returned with "several (Approx.3-4) t-shirts, 2 computer thumb drives (media storage cards, 1 Bradley University calendar and a poster." They then drove to Hoffman's personal vehicle, and Hoffman placed this merchandise in his car. Young then stated that he observed Hoffman on 3 other occasions removing items from the patrol car and place them in his personal car. He did not know for certain what these items were.

Officer Young's document ended up in the possession of Sergeant Hutchinson, who passed it on to Lt. Eeten, who was in charge of evaluating all police department personnel. Eeten discussed the allegations contained in the document with Gary Anna, and they decided to open an investigation. Eeten, who ordinarily reported to Chief Baer, was to be in charge of the investigation and was to report his findings directly to Anna.

The investigation revealed a number of things. First, Young's recollection of the wristband incident was discounted. The person in charge of the wristband stated that he had offered a wristband to Hoffman and told him it was free.

The investigation included, of course, questioning of Hoffman. He too prepared a typewritten statement on November 11. In that statement, he said that he had been working a soccer game when

t-shirts were being given out. He inquired whether Bradley staff were eligible to receive a free t-shirt and was told that they were. He said he would try to pick one up later and they told him "no problem." He forgot to get one that night. Several weeks later, when he was working with fellow officer Theresa McConnell, he told her about this conversation, so they went inside the ticket office to get the t-shirt. He explained the wristband situation, and categorically denied knowing anything about thumb drives. Eeten asked Hoffman to bring in all of the Bradley t-shirts he had. He later brought in a Red Out Nite shirt and said he couldn't find the others.

Eeten then interviewed officer Teresa McConnell. She prepared a written statement (Exh. 38) dated Nov. 11, 2009, in which she revealed that on one occasion she and Hoffman had been riding patrol together. They went into the locked ticket office at the stadium where she retrieved a t-shirt from a box and a Bradley bag. Hoffman took at least one t-shirt from the same box. She produced the t-shirt she had taken; it was a gray, long sleeved t-shirt with distinct red writing on it. Questioning of the Assistant Athletic Director Mary Lou Jansen revealed that this style of t-shirt had never been given away for free; they had only been sold. There were other types of t-shirts that were given out as promotional items at soccer games[5]. Jansen also informed Eeten that the Red Nite Out t-shirt that Hoffman had first been given away at the soccer game on 9/4/09. Leftover inventory of those shirts was stored not in the ticket office but in the storeroom area in the concession building until the homecoming game on 10/3/09, when they were again given away.

---

[5]Jansen identified four dates on which promotion items had been sold or given away: Red Out Nite shirts were given away at the gates and during the game on 9/4/09; Black Out Nite t-shirts were given away for a donation to Easter Seals on 9/25/09; Homecoming t-shirts were distributed in the tailgate aria on 10/3/09; and 10/21/09 Danny Dahlquist Wristbands and Trading Cards were sold and given away on 10/21/09.

Lt. Eeten received an email from Hoffman after the interview on November 11. In that email, he relayed that he had been trying to remember all the soccer games he had worked. With respect to a game he worked with Officer Young, he recalled:

> asking him about a t shirt ... because I was going inside to use the restroom. I remember him laughing about it and saying no I'm alright I don't want one. I honestly don't remember if I got one that evening. I honestly don't I do remember taking my coat off inside to use the restroom and carrying it back out to the car, but I don't remember taking a tshirt that night. The ones I have I can account for, all 4.

At about the same time as he sent that email, Hoffman was also texting Sergeant Hutchison. The first message read, "Hey sarge I've bn at home thinkn about all this shit and i think i did joke w shane that night about a tshirt id do remembr goin n 2take a piss but i dnnt rememb." The second message read, "If I gt a shirt or not I seriously dnt remebr that. I believe i came out w my jacket off tho. I did go n 2 use bathroom should i just email troy."

The following day, Eeten sent a memo to Gary Anna summarizing his investigation to date and advising him that he had suspended Hoffman pending further review. The investigation continued, and Eeten confronted Hoffman with the information he had obtained. On November 13, Hoffman prepared another typewritten statement. Eeten told Hoffman to type a confession as Eeten dictated it. Hoffman states that Eeten threatened to turn the matter over to the States Attorney for prosecution if he did not type and sign this statement. Hoffman stated that he stood on the information contained in his original statement, but he typed what Eeten dictated and he signed it.

In this statement, Hoffman acknowledged that he had taken the t-shirts that McConnell and Young had accused him of taking. He conceded that when first confronted, he was scared and did not tell the truth. He continued to maintain a complete lack of knowledge about the thumb drives. He concluded that he was "dishonest with my command and ... am willing and prepared to take full

11

responsibility for my actions." A second statement on that same date added the detail that, when Eeten asked him to bring in his Bradley t-shirts, he "purposely brought in the wrong one because I was scared to bring in the right one." He also stated that on both occasions that he took a shirt, he had not been given permission to enter the ticket office.

On November 13, 2009, Eeten sent a memo to Gary Anna, copying Nena Peplow, summarizing the results of the investigation. He stated that there were 3 facts he had determined:

1.   Officer Hoffman has committed theft(s) of Bradley University property (t-shirts) on 2 separate occasions.
2.   Officer Hoffman repeatedly lied during the investigation to cover his actions.
3.   Officer Hoffman tried to mislead the investigation by knowing [sic] providing Bradley soccer t-shirt he received for free instead of providing the t-shirt he took from the Shea Stadium ticket office as requested.

Eeten concluded by recommending that Hoffman be terminated from the Department, a recommendation that he stated he had discussed with Chief Baer who agreed.

On November 16, 2009, another Bradley police officer, Maria Cupi, prepared a written statement. She related a conversation she had earlier had with Hoffman, who she thought knew a lot about computers and might be able to help her find a Bradley duffle bag on line. A week or so later, Hoffman had given her one. When she asked where he got it, he said, "I can't tell you." She asked him if he took and he denied it. Another officer (Sgt. Fryer) said he thought Hoffman got it from someone at the stadium. On Nov. 11, Hoffman called Cupi and asked if she had told anyone about the bag; she said only Sgt. Fryer. Hoffman then told her he had been suspended for stealing a t-shirt and thumb drives. He denied taking them.

Over the next two days, Hoffman and Cupi texted each other. Eventually, he texted "Yep it old [sic] them I didnt take it at first but hutch gt me 2 admit it. gary anna will decide what my fate is." In response to her next question "So you did take it???" Hoffman replied, "Ya just didn't think

12

he would rat me u bettr watch it." Cupi then called Eeten and returned the bag. Attached to her statement were printouts of the text messages.

All of this information was made available to Anna. He reviewed Eeten's summaries as well as the statements given by Hoffman, McConnell, Cupi and the others, and the document sent by Young that had started the entire investigation. He - and Eeten as well - believed that, if the t-shirts Hoffman had taken were those given out as promotional items rather than sold, there had been no theft. From Eeten's investigation, however, he concluded that Hoffman had in fact taken a t-shirt that was never a promotional item. Equally important to Anna was Eeten's finding that Hoffman had lied and impeded the investigation. Anna did not conduct an independent investigation.

On November 17, 2009, Nena Peplow authored a letter terminating Hoffman's employment. After Anna reviewed that letter, it was sent to Hoffman. The letter summarized two reasons for the termination: (1) the two occasions on which he had taken t-shirts from the ticket office; and (2) lying and misleading the investigation by providing the wrong t-shirt to Lt. Eeten during the investigation. She concluded, "Dishonesty by a Bradley University police officer will not be tolerated."

Theresa McConnell, who had admitted taking one of the same t-shirts Hoffman took was also disciplined; she received a 10 day suspension.

Hoffman filed the complaint in this matter, alleging[6] that the termination of his employment was discriminatory based on his disability and/or retaliatory in response to his reports of Chief

---

[6]The complaint also included state law claims. Plaintiff conceded judgment on those claims (See Doc.#25), and summary judgment was granted in favor of Defendant as to those claims on April 2, 2012 (See Doc. #27). The complaint also included a claim for hostile work environment based on race and disability. In his response to the instant motion for summary judgment, Plaintiff expressly abandoned those two claims. (Doc. #35, p.3).

Baer's harassment of him due to his disability. Both of these claims arise under the Americans with Disabilities Act

## IV.  DISCUSSION

A.  Discrimination--Generally

Under the Americans with Disabilities Act ("ADA"), it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to ... terms, conditions, and privileges of employment." 42 USC § 12112(a); see *Hoffman v. Carefirst of Fort Wayne, Inc.*, 737 F.Supp.2d 976, 984 (ND Ind 2010). To prevail on an ADA discrimination claim, the plaintiff bears the burden of showing that (1) she is disabled; (2) she is qualified to perform the essential function of the job with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. Id, citing *E.E.O. C. v. Lee's Log Cabin, Inc.*, 546 F3d 438, 442 (7th Cir 2008).

An ADA plaintiff must present evidence of a causal connection between his complaints of disability discrimination and his termination. Put another way, a plaintiff must offer evidence that Defendant would not have terminated him "but for" his complaint of disability discrimination. *Serwatka v. Rockwell Automation Inc.*, 591 F3d 957 (7th Cir 2010). The ADA does not authorize mixed-motive disability discrimination claims.

There are two methods of proof available to a plaintiff in an ADA case for discrimination or for retaliation: the direct method and the indirect method. See, *Rudin v. Lincoln Land Community College*, 420 F3d 712, 720 (7th Cir 2005). Plaintiff responds to the motion for summary judgment with arguments under each method, so as to each claim, both methods require analysis.

1.  Discrimination–direct method.

The direct method of proof requires plaintiff to put forth sufficient direct or circumstantial evidence that demonstrates directly the employer's intent to discriminate against him because of his disability. *Rudin*, 420 F3d at 720. Direct evidence of illegal motivation traditionally requires some sort of "smoking gun," such as a statement by the decision-maker or eyewitness testimony about the decision-maker's thought process or some sort of an admission that the decision was based on prohibited animus. *Radue v. Kimberly-Clark Corp.*, 219 F3d 612, 616 (7th Cir 2000). Hoffman has no smoking gun.

He does, however, offer circumstantial evidence, which can also directly establish discriminatory intent through a "longer chain of inferences." *Dickerson v. Board of Trustees of Community College District No. 522*, 657 F3d 595, 601 (7th Cir 2011). The types of circumstantial evidence that can create such a chain include suspicious timing; ambiguous statements; behavior toward or comments directed at other employees in the protected group; more favorable treatment of similarly situated employees not within the protected class; or evidence that the employer's stated reason for the difference in treatment is unworthy of belief. *Rudin*, 219 F3d at 721.

The two pieces of circumstantial evidence which Hoffman posits to suggest discriminatory intent are: Officer McConnell, who was similarly situated but not disabled, was treated more favorably than he was, and the reasons given for his termination are not credible.

 Hoffman was fired, while McConnell was only suspended, and Hoffman asserts that this differential discipline was imposed for precisely the same misconduct: taking a t-shirt from the stadium ticket office. In order for this to be meaningful, Hoffman and McConnell must be "similarly situated" or "comparable", which means that there must be "sufficient commonalities on the key

variables ... to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrmination." *Humphries v. CBOCAS West Inc.*, 474 F3d 387, 406 (7th Cir 2007), aff'd 553 US 442 (2008); *Coleman v. Donahoe*, 667 F3d 835, 841 (7th Cir 2012). In *Coleman*, the plaintiff was an African American woman who had previously complained of discriminatory treatment. After she told her psychiatrist she was having thoughts of killing her supervisor, her employment was terminated. She presented evidence that two white male employees at the same facility had recently threatened another employee at knife point; they received only one week suspensions from the same manager who had fired her. She alleged that the termination of her employment was discriminatory and retaliatory.

The Seventh Circuit reversed the District Court's finding that the two males were not comparators because they had different direct supervisors. The Court first noted that the "similarly-situated inquiry is flexible, common-sense, and factual." Id at 846. The Court emphasized that the purpose of this analysis is to "eliminate other possible explanatory variables" in order to "isolate the critical independent variable - discriminatory animus." Id This means that the comparator and the plaintiff must have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id at 847, quoting *Snipes v. Illinois Dep't of Corrections*, 291 F3d 460, 463 (7th Cir 2002).

In this case, both officers were probationary; both served in the same department for the same supervisor, and both were disciplined by Gary Anna. There is, however, one major difference: the misconduct for which they were disciplined was *not* the same. When confronted with questions about taking a t-shirt from the stadium ticket office, McConnell immediately was forthcoming, admitting her conduct and her fault. Hoffman, on the other hand, dissembled, then lied, and then

16

tried to mislead Lt. Eeten. His own e-mail to Officer Cupi confirms some of this conduct: "Yep it old them i didn't take it at first but hutch gt me 2 admit it gary anna will decide what my fate is." [sic]. He does not dispute that when he was asked to bring in the Bradley t-shirts he had, he did not bring in the one he obtained from the stadium ticket office; he simply says he "was afraid" to bring in the requested shirt so he brought in a different one.

While McConnell was suspended for taking a t-shirt, Bradley did not fire Hoffman simply because he took a t-shirt. The letter given to Hoffman articulated two reasons for his termination: (1) taking a t-shirt on two occasions, and (2) lying to and misleading the investigator. McConnell was disciplined for taking a t-shirt on one occasion, not two, and she was found to have been appropriately contrite and cooperative. These factors differentiate the misconduct for which these two employees were being disciplined, and as a result, McConnell is not a comparator. See, *Naficy v. Illinois Dep't of Human Services*, 2012 WL 4070115 (7th Cir) (the distinctions between the plaintiff and her proffered comparator found to be material in that "they go to the heart of why [plaintiff] received different treatment."). The difference in Bradley's response to the two officers' misconduct cannot reasonably support an inference of discriminatory intent.

Hoffman next attempts to show that Bradley's stated reasons for terminating his employment were unworthy of belief[7]. For that proposition, he relies on statements by Gary Anna and Lt. Eeten, conceding that his conduct would not have constituted theft if the t-shirts he took had been given for free. According to Hoffman, the investigation did not conclusively establish that the t-shirt he took had never been offered for free. Hoffman therefore concludes that it is up to a jury to decide whether Eeten's and Anna's beliefs that Hoffman stole the t-shirts were in good faith.

---

[7]Showing pretext under the direct method is substantially the same as it is under the indirect method. *Venturelli v. ARC Community Services, Inc.*, 350 F3d 592, 601 (7th Cir 2003).

As the Seventh Circuit has explained, to establish pretext, a plaintiff must identify "such weaknesses, implausibilities, inconsistencies, or contradictions" in the stated reasons that a reasonable person would find them unworthy of credence and "hence infer that [defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F3d 781, 792 (7th Cir 2007). If the employer "honestly believed" the reasons it gave, however, the plaintiff loses "even if the reasons were ... baseless." Id

Assume for the sake of argument that the Jansen report - the one that identified which t-shirts had been given away for free at some soccer game - was not sufficient to establish that Hoffman took a t-shirt that had *not* ever been offered for free. What does that do to the investigatory report as a whole, the one on which Anna relied to make his decision to fire Hoffman?

I conclude that it does little if anything to discount the believability of the report. The fact that there was no conclusive proof that Hoffman had taken the same t-shirt as McConnell dId was due largely (perhaps entirely) to the fact that Hoffman refused or was unable to produce that specific t-shirt, not to any shortcoming of the investigation. It does nothing at all to discredit the investigation or the documents considered by Anna at the time he made his decision. Those documents included Hoffman's contradictory written statements; the written statements by McConnell and other officers; the incriminating emails Hoffman sent to Sgt. Hutchison and to Officer Cupi; and the t-shirt McConnell admitted taking, which was a t-shirt that Jansen told Eeten had always been sold and had never been offered for free. While Hoffman challenges his contradictory written statements as having been coerced by Lt. Eeten, he did not do so contemporaneously, so Anna had no reason to doubt that Hoffman had simply decided to come clean after originally lying about his conduct.

18

Hoffman tries to taint Eeten's report as biased, suggesting that because Lt. Eeten was supervised by Chief Baer, and that because Anna knew about Baer's prior harassment of Hoffman, Anna should not have accepted the report without more investigation. First, the suggestion that Baer had any hand in the investigation at all is rank speculation; there is no evidence that Baer provided any input into the investigation[8]. In fact, Lt. Eeten was selected by Anna to run the investigation, and Eeten reported directly to Anna. Second, Anna had heard nothing more about any problems between Chief Baer and Hoffman since his meeting in February, more than 8 months earlier. Regardless of Hoffman's reasons for not making further complaints after that meeting, the undisputed evidence is that, in November, Anna was wholly unaware of any continuing problems.

Neither piece of circumstantial evidence creates any doubt as to Anna's honestly held belief that Hoffman had engaged in a theft and had lied to cover his tracks or to Anna's conclusion that Hoffman's conduct was inappropriate for a Bradley police officer. Even if Hoffman had not actually stolen a t-shirt or two, he has produced no evidence at all to challenge the honesty of Anna's belief that he had not only done so but had also lied to and attempted to mislead Lt. Eeten during the investigation. As the Seventh Circuit has said "more times than we can count," when an employer articulates a "plausible, legal reason for discharging the plaintiff, "it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Silverman v. Board of Education of the City of Chicago*, 637 F3d 729, 738 (7th Cir 2011).

---

[8]This is simply not a case in which the "cat's paw" theory has been properly raised or supported by evidence. See,. *Harris v. Warrick County Sheriff's Dep't*, 666 F3d 444, 448 (7th Cir 2012). There is no evidence that Baer was involved in either Eeten's decision to recommend that Hoffman be terminated or in Anna's decision to discharge Hoffman, so any *animus* Baer may have held cannot be attributed to Anna.

There is no direct evidence at all, and the circumstantial evidence is insufficient to allow a jury to reasonably infer intentional discrimination. I find that the scintilla of evidence submitted by Plaintiff is insufficient to sustain his direct method of proof on the issue of discrimination.

2.  Discrimination--indirect method.

The ADA was amended in 2008. Pub. L. No. 110–325 (2008). Those amendments were effective January 1, 2009, so they apply to this case. Post-amendment case law has consistently applied pre-amendment cases stating the elements of the indirect method of proof, namely the prima facie case of ADA discrimination. See discussion in *Snyder v. Livingston*, 2012 WL 1493863 *6, (ND Ind). See also, *Hoffman*, 737 F. Supp.2d at 984; *Becker v. Elmwood Local Sch. Dist., No. 3*, 2012 WL 13569 *9 (ND Ohio) (citing 6th Circuit cases); *Fleck v. Wilmac Corp.*,2011 WL 1899198*4 (ED Pa) (citing pre-amendment Third Circuit cases as support for the prima facie elements of an ADA discrimination claim). I conclude that the prima facie elements of an ADA discrimination claim remain the same after the statutory amendments.[9]

The indirect method is the familiar burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973). See, *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F3d 479, 483 (7th Cir2002); *Buie v. Quad/Graphics, Inc.*, 366 F3d 496, 503 (7th Cir 2004). Plaintiff therefore must satisfy the four requirements for a prima facie case by submitting evidence that, if believed, would show that: (1) he is disabled within the meaning of the ADA; (2) he was meeting his

---

[9]Plaintiff points out that one of the primary purposes of the 2008 amendments was to eliminate the "extensive analysis" of whether a plaintiff is actually "disabled" within the meaning of the ADA and refocus on whether employers - and the employee - have complied with their statutory obligations. 42 USCA § 12102(4); 29 CFR Pt 1630, App. "Interpretive Guidance on Title I of the ADA", (effective May 24, 2011). The question whether Plaintiff in this case is disabled is not a question raised in the pending motion. The court may and does assume - for purposes of this motion and without deciding the question - that Plaintiff meets the statutory definition as amended.

employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment. *Amadio v. Ford Motor Co.*, 238 F3d 919, 924 (7th Cir2001). If he is able to prove all four elements, the burden shifts to Defendant to identify a non-discriminatory reason for its employment decision; once such a reason is articulated, the burden shifts back to the plaintiff to produce evidence that the reason was but a pretext for intentional discrimination. *Buie*, 366 F3d at 503.

His indirect method of proof fails for similar reasons as did his direct method. First, he has filed to establish a prima facie case because he has pointed to no similarly situated employee who received more favorable treatment. As discussed above, the only comparatory to whom Hoffman points - Officer McConnell - is not a proper comparator.

Likewise, he has filed to produce evidence sufficient to create a question as to pretext. His challenges to the stated reasons for his termination all point to the accuracy of the facts on which Gary Anna relied and not, as is required, to the honesty of Anna's belief that the facts were correct and the discipline proper.

There is no direct evidence at all, and the circumstantial evidence is insufficient to all a jury to reasonably infer intentional discrimination. I find that the scintilla of evidence submitted by Plaintiff is insufficient to sustain his indirect method of proof on the issue of discrimination.

B.  Retaliation--General

The ADA prohibits employers from retaliating against employees who assert their rights under the Act. 42 USC § 12203(a). Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless. *Squibb v. Mem'l Med. Ctr.,* 497 F3d 775, 786 (7th Cir 2007). As in the discrimination context, a plaintiff can

establish a valid case of retaliation using either the direct or indirect method of proof. *Kersting v. Wal–Mart Stores, Inc.,* 250 F3d 1109, 1117 (7th Cir 2001). The ADA's proscription against retaliation, 42 USC §12203(a), employs language comparable to that of Title VII, 42 USC § 2000e–3(a); Title VII retaliation cases provide guidance in assessing Hoffman's retaliation claim. See, *Davidson v. Midelfort Clinic, Ltd.*, 133 F3d 499, 511 (7th Cir 1998).

Hoffman asserts that his informal complaints about Baer's conduct constituted protected activities under the ADA. He is correct. See, *Casna v City of Loves Park,* 574 F3d 420, 426 (7th Cir 2009). The question is whether, using either the direct or indirect method, Hoffman can produce sufficient evidence to create a question as to the requisite causal connection between his discharge and those complaints.

1.   Retaliation--direct method.

To establish a case of retaliation under the direct method of proof, a plaintiff must show (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two. *Feldman v. Olin Corp.*, 2012 WL 3641774 (7th Cir); *Casna,* 574 F3d 420 at 426; *Dickerson,* 657 F3d at 601-02; *Chapin v. Fort–Rohr Motors, Inc.,* 621 F3d 673, 677 (7th Cir2010). For the purposes of this motion, only the third prong is in question.

In the case at bar, Hoffman asserts that his complaints about Baer's conduct fell on deaf ears and were never investigated. This, he claims is evidence that causally links his complaints with his discharge. A careful analysis of this argument reveals its lack of substance.

Hoffman informally complained about Baer in 2008 to two different individuals in the Human Resources Department, Sorrell and Peplow. Both of them met with him and discussed his concerns. He was encouraged to come to them if the problem continued and also to talk to Gary

Anna. He talked to Anna in February 2008, relaying his concerns about Baer's conduct. Anna told him that he would remind Baer of those policies and "take action if necessary or as appropriate if that kind of behavior exhibited itself." Anna also asked Hoffman to return to him if the behavior continued.

It is therefore undisputed for purposes of this motion that Anna did know about Hoffman's complaints about the Police Chief Baer during 2008. It is also true that, after this February 2008 meeting with Anna, Hoffman did not return to Gary Anna with any further complaints about Baer.

Hoffman did however, informally complain to Sorrel again, at a soccer game in 2009. She advised him to talk to Lt. Eeten, who was one of his supervisors, before coming back to Human Resources. Hoffman did not do that because this was not, according to him, the appropriate procedure when the harasser is a department head. The appropriate procedure in that situation is to go to Human Resources. But Hoffman did not follow that procedure either, because, he says, he interpreted Sorrel's advice as meaning that Human Resources would not do anything unless he talked to Eeten first, something he was afraid to do. So instead of discussing this further with Sorrell - or with Peplow - he did nothing. He made no further complaints about Baer to anyone.

Yet he asserts that Bradley's failure to investigate his complaints about Baer is "sufficient to establish a triable issue of fact on the causal connection between reports of discrimination and adverse employment action." In support of that proposition, he cites *Temple v. Pflunger*, 2011 WL 2118695 *6 (ED Ky). In that case, a female employee testified that she had complained about her superior's overt sexual conduct on two occasions, as well as about his threat to her after he found out she had complained. She was told it would be handled; she was not told to contact human resources or given any further information. When the conduct continued, she complained again and

requested a transfer. Her superior physically threatened her, verbally abused her, and damaged her car. She was terminated due to her "personality conflict" with her superior. All of this occurred between her hire in June of 2008 and her discharge in October of 2008. The Court concluded that she had presented enough evidence to create a question about causal connection. Id at *8. What the *Temple* Court did not find was that the employer's failure to investigate her claims of misconduct created a question of fact about a causal link.

In the case before this Court, Hoffman's complaints about Baer's misconduct did not fall on deaf ears. They were heard all the way up to the Vice President level. He was told to feel free to return if matters did not improve, and was assured by Anna that Baer would be reminded of Bradley's policies. Plaintiff has presented no evidence to contradict Anna's testimony that he followed up with the promised conversation with Baer. Unlike the plaintiff in *Temple*, Hoffman did not complain again when Baer's conduct resumed.  If Anna and Peplow heard nothing more from Hoffman after that, they can be forgiven for believing that the situation had in fact improved. There was no obligation to investigate when there was no extant complaint.

Throughout the period of time when Hoffman was working with restrictions, Bradley accommodated those restrictions. Each time Hoffman brought to the attention of a Bradley administrator his concerns about Baer's attitude about those restrictions, the appropriate Bradley administrator addressed his concerns. Between the time of his last report to an administrator and the time of his discharge, there was an intervening event - the letter from Officer Young - that cut off any causal link between his disability and his discharge. Hoffman has failed to produce any evidence that would support his claim of retaliation under the direct method of analysis.

2.  Retaliation--indirect method.

24

Plaintiffs can also elect to use the indirect, burden-shifting method for retaliation claims, under which the plaintiff must demonstrate that he (1) engaged in protected activity; (2) was performing his job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *Dickerson*, 657 F3d at 601-02. Once a plaintiff satisfies his initial burden, the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual. Id at 602.

Hoffman has failed to produce any evidence of similarly situated employees who were treated more favorably than he. The only similarly situated employee he has identified is Officer McConnell. As was discussed above, McConnell was not comparable in material respects, and the differences between McConnell and Hoffman support the difference in discipline that were imposed on the two officers. Hoffman has therefore failed to state a prima facie case.

Even were the Court to assume that McConnell was similarly situated, Hoffman has failed to produce evidence of pretext to rebut Bradley's clearly legitimate, non-discriminatory explanation for terminating Hoffman's employment. As was thoroughly discussed above, Hoffman speculates about Baer's influence on the investigation, but he produces no evidence of Baer's involvement at any stage of the investigation or in the decision. He criticizes Bradley's investigation, but he failed to do anything that would have mandated one. He backtracks on his confessions, but he produces no evidence that Anna was ever told, prior to this lawsuit, that coercion was involved. His entire argument as to pretext is nothing more than speculation, and "[i]nferences that are supported by only

speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Village of Winnetka*, 371 F3d 992, 1001 (7th Cir 2004).

Either because he failed to state a prima facie case or because he failed to rebut Bradley's legitimate, non-discriminatory reason for terminating his employment by coming forward with evidence of pretext, Hoffman has failed to produce sufficient evidence to sustain his claim of retaliation using the indirect method.

## V. CONCLUSION

Hoffman's evidence consists of little more than weak justifications for why he took t-shirts and why he did not follow the personnel policy for filing complaints. Nothing - not suspicious timing, not remarks by any decision maker, not evidence linking the Chief with Anna's decision - calls into question the legitimacy of Bradley's conclusion that it would not condone from a police officer the type of dishonesty displayed by Hoffman.

Hoffman has offered nothing from which a rational juror might conclude that the termination of his employment was motivated by a prohibited purpose. Accordingly, the motion for summary judgment is granted in its entirety. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff.

ENTER this 27th day of September, 2012

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE

26